IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAREL HARDENBROOK, an individual, PAUL GOOCH, an individual and ROBERT ORLOFF, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED PARCEL SERVICE, CO., a Delaware corporation,<br><br>Defendant. | Case No. CV 07-509-S-EJL-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## I.
## Introduction

Pending before the Court is Plaintiffs Hardenbrook, Orloff, and Gooch's (collectively, "Hardenbrook") Motion to Amend Complaint to add a prayer for punitive damages (Docket No. 37) and Defendant United Parcel Service Company's ("UPS") Motion to Strike paragraphs nine and ten of the Affidavit of Jeff Proost (Docket No. 57). The Court conducted a hearing on September 22, 2009. Having carefully reviewed the record, considered oral arguments, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order denying Plaintiffs' Motion to Amend and granting Defendant's Motion to Strike.

**MEMORANDUM DECISION AND ORDER  - Page 1**

**II.**
**Discussion**

**A.      Motion to Amend Complaint and Allege Punitive Damages.**

       **1.      Factual Background.**[1]

Hardenbrook, Gooch, and Orloff claim that they suffered retaliation after complaining to UPS management about potential violations of the Department of Transportation's ("DOT") hours of service regulations applicable to UPS employees.  The DOT regulations prohibit drivers of commercial vehicles from driving if they have exceeded a specified number of work hours for a prescribed period of time.  For example, the regulations prohibit drivers from operating a commercial vehicle after having been on-duty for sixty or more hours in seven consecutive days.

UPS issues its drivers electronic log books called "DIADs" that record each driver's on-duty time, off-duty time, and on-road or off-road time.  The DIAD generates reports that are reviewed by management personnel and subject to audit.  UPS is therefore able to monitor compliance with the DOT hours of service regulations by its drivers.

However, UPS admits that it sometimes asks salaried personnel, which included Hardenbrook, Gooch, and Orloff, to drive commercial vehicles during peak season, such as the Christmas holiday.  UPS admits that supervisory personnel are subject to the hours of service regulations if they are asked to drive, and that when they do drive, forms should be completed to indicate their duty status.  Nevertheless, UPS personnel have admitted that UPS does not require its supervisors to prepare a "record of duty status form" or any other documentation that relates to salaried personnel driving a UPS commercial vehicle.  Yet, salaried personnel are often asked

_____

[1]  No part of the factual recitation herein constitutes findings of fact for purposes of the pending motion for summary judgment, Docket No. 40.

**MEMORANDUM DECISION AND ORDER  - Page 2**

to work long hours in addition to time they might spend as intermittent drivers.  But without proper documentation, it would be impossible to discern whether a manager or supervisor, who does not punch a time clock, complied with applicable hours of service regulations.

The Complaint, as well as the Proposed Amended Complaint, asserts that in December 2005, an e-mail was sent to various UPS employees reminding them of the hours of service regulations and their application to UPS employees.  Hardenbrook and Gooch sought to clarify whether the DOT regulations were applicable to management level employees such as themselves.  Hardenbrook expressed to Gooch concerns that, if supervisors were asked to drive and deliver packages during the 2005 Christmas season, a large number of supervisors would violate the hours of service regulations.

In response to Hardenbrook's concerns, on December 17, 2005, Gooch e-mailed Mr. Brad Whitworth, the safety director for the UPS region that includes Boise, and relayed those concerns.  Within that e-mail, Gooch indicated he had worked in excess of 80 hours that week and also that several supervisors had inquired regarding the application of hours of service regulations to them.  He requested clarification regarding the applicability of the hours of service regulations to management employees.  Gooch did not receive a response from Whitworth, despite re-sending his e-mail on December 20, 2005.  Between December 20 and 22, 2005, Gooch sent another e-mail expressing his frustration for the delayed response, and stated that if he did not receive an answer he would raise the issue with the Department of Transportation.

Gooch contends that he was sent home after the e-mail exchange and told to call his supervisor on Monday to see whether he "still had a job."  UPS management personnel, on the other hand, contend they sent Gooch home precisely because if he drove, he potentially would

**MEMORANDUM DECISION AND ORDER  - Page 3**

violate the hours of service regulations.  Orloff supposedly was chastised by his supervisor for

"failing to control his people," referring to Gooch and Hardenbrook.  Gooch returned to his job

after the intervening absence.

The incidents with Gooch and Orloff allegedly had a "chilling effect" on supervisory

personnel, as they were afraid to raise concerns if they were asked to drive and knew they might

violate the hours of service regulations.  No investigation was conducted regarding

Hardenbrook's concerns, or whether such violations in fact occurred.  UPS took no steps to

change the way it monitored compliance by its supervisors with the hours of service regulations,

and UPS conducted no further training to inform employees of the hours of service regulations.

After December 2005, workplace tensions increased as a result of the incident that sent Orloff

home.  But other than Orloff being sent home, no one suffered any adverse employment

consequences at that time.

Because of the stir created, Jeff Proost suggested to Gooch that he resign his position on

the Workplace Flexibility Committee, which Gooch did.  Hardenbrook thereafter was appointed

to the Committee.  The Committee was established to air and address workplace concerns, and

its members were encouraged to speak openly and frankly about workplace issues.  Supervisors

and managers were supposed to submit a self report to the Committee indicating the hours

worked and days spent delivering packages.

On May 9, 2006, a Committee meeting was held during which members were encouraged

to solicit feedback from other supervisors about workplace flexibility issues.  Hardenbrook took

that encouragement to heart, and on May 11, 2006, sent an e-mail to division supervisors and

managers providing requested feedback and suggesting that certain individuals might benefit

**MEMORANDUM DECISION AND ORDER  - Page 4**

from "job appreciation training" as well as switching jobs for a day.  Hardenbrook also sent a

second e-mail to supervisors and managers suggesting that accomplishment recognition be

provided, and singling out an instance where Mr. Whitworth, rather than recognizing an

accomplishment, left a voice-mail telling his subordinates how "bad they suck."

Hardenbrook's supervisors, Mr. Moore and Mr. Kenney, viewed the e-mails as

"insubordinate" and began monitoring Hardenbrook's e-mail and internet activity.  They chose

not to speak to Hardenbrook about the e-mails or otherwise discipline him at the time the e-mails

were sent.  On May 25, 2006, e-mail shadowing of Hardenbrook's computer was authorized.

On June 28, 2006, Hardenbrook was asked to complete an on-line Business Ethics

Questionnaire ("BEQ"), which UPS had designed to allow employees to address perceived

ethical or legal compliance issues by UPS.  Hardenbrook prepared his responses as directed.

One of his responses concerned his perception of the incident back in December 2005 when

Gooch was sent home for raising concerns about hours of service violations by salaried

personnel.  Hardenbrook's BEQ was thereafter submitted to the UPS corporate Compliance

Department.

On or about July 13, 2006, Orloff, who was Hardenbrook's supervisor, was confronted

by Mr. Moore, who asked Orloff whether he was "losing control" over the Idaho Division,

specifically referencing Hardenbrook's BEQ response.  After this discussion, Hardenbrook's

BEQ responses disappeared from the computer system.  UPS contends that the BEQ responses

were not intentionally deleted, and suggests that the computer server "timed out" during

submission of the BEQ responses.

On July 11, 2006, Mr. Kenney, the district Human Resources Manager, requested that

**MEMORANDUM DECISION AND ORDER  - Page 5**

Hardenbrook's employment be terminated.  The stated reasons for termination included

"[i]mproper use of Company equipment, sending job resumes, applications, and job searches

from a UPS computer, composing and sending derogatory e-mails to peers.  Negative comments

directed toward District Manager and Division Manager included in e-mails."  (Mem. at 21,

Docket No. 55.)  Hardenbrook claims that internal investigation guidelines, which allow for an

employee to explain any adverse issues, were not followed in the decision to terminate his

employment.  Mr. Kenney terminated Hardenbrook's employment on July 24, 2006.

Gooch's and Orloff's employment suffered adverse consequences after investigation into

a timecard irregularity.  Mr. Shreve, the division security manager, discovered that some Boise

Center supervisors were manipulating DIAD information to avoid reflecting that an additional

driver was on-road helping to unload packages.  The investigation revealed that a utility

driver/preloader, Anne Buckingham, had been assisting drivers with unloading packages from a

stationary trailer and carting them to a retailer at the Boise Town Square Mall.  However, her

time was moved from her DIAD to the truck driver's DIAD to avoid reflecting her assistance.

Mr. Proost, the Boise Center Business Manager, was responsible for directing that the

employees handle Ms. Buckingham's time records in this manner, and had made an inquiry to

Industrial Engineering personnel to confirm whether or not the matter was being handled

correctly.  Mr. Proost had asked Orloff to ask management why they were not responding to his

inquiries.  Orloff maintains he was unaware why Proost was requesting the feedback,

acknowledging only that feedback was requested and Proost had not received it.

Gooch asserts he had no knowledge the time card information was being altered.  When

he found out, he allegedly spoke to Proost, and requested that the employees responsible for the

**MEMORANDUM DECISION AND ORDER  - Page 6**

behavior stop.  Other than the request by Proost to find out why Enginneering had not returned Proost's inquiries, Orloff also maintained he had no knowledge of the time card irregularities. Despite their lack of knowledge, Orloff was demoted while Gooch's employment was terminated on July 26, 2006, based upon their alleged involvement with the time card incident.  Mr. Moore apparently directed the adverse employment actions due to Orloff's inability to control the two "troublemakers," identified since December 2005 as Gooch and Hardenbrook.  Six other employees investigated during the timecard incident did not lose their jobs.  Gooch and Orloff maintain that they lost their jobs because of the incident in December 2005, and that their tenuous involvement in the timecard incident provided a convenient excuse for UPS.

  2.  **Summary of the Complaint.**

   The Complaint alleges that Hardenbrook, Gooch, and Orloff suffered retaliation in violation of Idaho public policy.  Specifically, they assert that they suffered adverse employment consequences for raising the hours of service violations and that the public policy exception to their at-will employment status applies.  Second, the plaintiffs allege breach of contract based upon UPS's promise that they would not be retaliated against for reporting violations of the law and honestly discussing workplace issues.  And finally, Plaintiffs allege that UPS breached the covenant of good faith and fair dealing inherent in every employment relationship by firing or demoting them contrary to federal law in response to raising hours of service violations.

   Hardenbrook seeks to add a prayer for punitive damages as to all three of the claims, contending that UPS's conduct constituted an extreme deviation from reasonable standards of care.  Hardenbrook argues that UPS's willful concealment of its illegal conduct in failing to comply with DOT hours of service regulations justifies the award of punitive damages, and

satisfies the legal standard for allowing Plaintiffs to amend their complaint.  UPS argues that

Hardenbrook's argument about UPS's alleged hours of service violations and lack of record

keeping to monitor compliance is a "red herring," because the legal standard applicable to

amendments allowing punitive damages requires evidence that UPS acted with a harmful state of

mind directed toward Plaintiffs during the act of terminating their employment.  UPS asserts that

Hardenbrook has failed to offer any proof of a harmful state of mind or any outrageous or willful

conduct directed at Plaintiffs when they were fired or demoted, and thus argues Hardenbrook

may not amend the complaint.

The parties dispute the underlying factual information asserted by Hardenbrook, and

there currently is a motion for summary judgment filed by UPS pending before District Judge

Edward J. Lodge.  However, for the purposes of this memorandum, the assertions made by

Hardenbrook will be accepted by the Court as true.  UPS's contentions that all three plaintiffs

were fired or demoted for legitimate business reasons also are duly noted for the record.

### 3.      Legal Standards for Asserting Punitive Damages.[2]

Claims for punitive damages are substantive and Idaho law is therefore controlling in

diversity cases.  *See Strong v. Unumprovident Corp.*, 393 F.Supp.2d 1012, 1025 (D.Idaho 2005)

("[W]hether to permit a claim for punitive damages is substantive in nature and accordingly is

controlled by relevant Idaho case law." (citing *Doe v. Cutter Biological*, 844 F.Supp. 602, 610

(D.Idaho 1994))).

Idaho Code § 6-1604 directs the court to grant a motion to amend to seek punitive

---

[2]  To give credit where credit is due, the legal standards set forth in this decision were adapted
from *Davis v. Nevarez*, Case No. CV 07-427-E-EJL-LMB, 2009 WL 1532270 at *6–8 (D. Idaho May 29,
2009).

MEMORANDUM DECISION AND ORDER  - Page 8

damages if, "after weighing the evidence presented, the court concludes that, the moving party has established . . . a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages."  Idaho Code § 6-1604.  An award of punitive damages is permissible only where the claimant proves, "by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." *Id.*

As a matter of substantive law, it is well established in Idaho that punitive damages are not favored and should be awarded only in the most unusual and compelling circumstances, and are to be awarded cautiously and within narrow limits.  *Manning v. Twin Falls Clinic & Hosp., Inc.*, 830 P.2d 1185, 1190 (Idaho 1992) (citing *Jones v. Panhandle Distributors, Inc.*, 792 P.2d 315 (Idaho 1990); *Soria v. Sierra Pac. Airlines, Inc.*, 726 P.2d 706 (Idaho 1986); *Cheney v. Palos Verdes Inv. Corp.*, 665 P.2d 661 (Idaho 1983); *Linscott v. Rainier National Life Ins. Co.*, 606 P.2d 958 (Idaho 1980); *Hatfield v. Max Rouse & Sons Northwest*, 606 P.2d 944 (1980)); *see also O'Neil v. Vasseur*, 796 P.2d 134, 142 (Idaho Ct.App.1990).  Punitive damages may be recovered in a contract action.  *Cuddy Mtn. Concrete, Inc. v. Citadel Construction, Inc.*, 824 P.2d 151, 158 (Idaho Ct. App. 1992).  However, breach of the underlying contract by itself is not sufficient to warrant an award of punitive damages.  *General Auto Parts Co., Inc. v. Genuine Parts Co.*, 979 P.2d 1207, 1211 (Idaho 1999).

An award of punitive damages will be allowed only when the defendant acted in a manner that was "an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences."  *Manning*, 830 P.2d at 1190 (quoting *Cheney*, 665 P.2d at 669).  Further, the

Supreme Court of Idaho has clearly defined the parameters of such an award, and has stated that "to support an award of punitive damages, [plaintiff] must prove [defendant's] actions toward [plaintiff] constituted an extreme deviation from standards of reasonable conduct, which was done with knowledge of the likely consequences and an extremely harmful state of mind." *Seiniger Law Office, P.A. v. North Pacific Ins. Co.*, 178 P.3d 606, 615 (Idaho 2008).  In other words, "[t]he issue revolves around whether the plaintiff is able to establish the requisite intersection of two factors: a bad act and a bad state of mind." *Todd v. Sullivan Const. LLC.*, 191 P.3d 196, 201 (Idaho 2008) (citing *Myers v. Workmen's Auto. Ins. Co.*, 95 P.3d 977, 985 (Idaho 2004)).  An award of punitive damages "serves the dual function of deterrence and expressing society's outrage." *Todd*, 191 P.3d at 201 (quoting *Curtis v. Firth*, 850 P.2d 749, 760 (Idaho 1993)).  In a contract action, an award of punitive damages generally is based on conduct which is unreasonable and irrational in the business context, and demonstrates a lack of professional regard for the consequences of the breach of the contractual agreement.  *Cuddy Mtn. Concrete, Inc.*, 824 P.2d at 160.

When the moving party's claims are reasonably disputed and there is substantial evidence that supports the non-moving party's claims, a motion to amend to assert punitive damages will not be allowed.  *See Strong*, 393 F.Supp.2d at 1026 (finding plaintiff had not established reasonable likelihood of proving by a preponderance of evidence[3] "the requisite 'extremely

---

[3]  *Strong* involved Idaho Code § 6-1604's "preponderance of the evidence" standard before its amendment in 2003.  Section 6-1604 now places a higher burden on the moving party, *i.e.*, a requirement for "clear and convincing evidence." *See also* BLACK'S LAW DICTIONARY 596 (8th ed. 2004) ("clear and convincing evidence . . . . This is a greater burden than preponderance of the evidence . . . .").  Thus, the *Strong* standard remains applicable.  That is, if the moving party's claims are reasonably disputed and there is substantial evidence that supports the non-moving party's claims, the moving party has not met its burden under the substantial evidence standard, compelling the same conclusion under an even higher burden of clear and convincing evidence.

**MEMORANDUM DECISION AND ORDER  - Page 10**

harmful state of mind' and 'extreme deviation from reasonable standards'" because of conflicting evidence) (citing *Kuntz v. Lamar Corp.*, 385 F.3d 1177, 1187 (9th Cir. 2004)).

Idaho state courts have also made clear that, with respect to punitive damages claims, the decision whether to submit the punitive damages question to a jury rests within the sound discretion of the trial court. *Manning v. Twin Falls Clinic & Hosp.*, 830 P.2d 1185, 1190 (Idaho 1992) (additional citations omitted). In this respect, the federal courts are in accord with Idaho state substantive and procedural law. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Fed. R. Civ. P. 15(a) encourages the liberal granting of motions to amend pleadings. However, whether to amend the pleadings to assert a claim for punitive damages is another matter, requiring a different standard as is consistently reflected in the significant case law in this jurisdiction. *Todd*, 191 P.3d at 201; *Hall v. Farmers Alliance Mut. Ins. Co.*, 179 P.3d 276, 282–283 (Idaho 2008); *Vendelin v. Costco Wholesale Corp.*, 95 P.3d 34, 41–42 (Idaho 2004); *Vaught v. Dairyland Ins. Co.*, 956 P.2d 674, 679–680 (Idaho 1998); *see also O'Neil v. Vasseur*, 796 P.2d 134, 142 (Idaho Ct.App.1990) (stating that "[p]unitive damages are not favored in the law and should only be awarded in the most unusual and compelling circumstances.").

As the case law reflects, Hardenbrook will be allowed to amend the pleadings to assert a prayer for punitive damages only if, after weighing the evidence presented, the Court concludes that Hardenbrook has established a reasonable likelihood of proving, by clear and convincing evidence, that UPS's conduct in terminating the employment of Hardenbrook and Gooch, and demoting Orloff, was oppressive, fraudulent, malicious, or outrageous. *See Vendelin*, 95 P.3d at 41. "Clear and convincing evidence is generally understood to be [e]vidence indicating that the thing to be proved is highly probable or reasonably certain." *State v. Kimball*, 181 P.3d 468, 472

(Idaho 2008) (internal quotations omitted).

### 4.   Plaintiffs Have Not Met the Requisite Standard by Clear and Convincing Evidence.

An at-will employee may be discharged at any time for any reason without incurring liability.[4]  *Van v. Portneuf Medical Center*, 512 P.3d 982, 991 (Idaho 2009) (citing *Jenkins v. Boise Cascade Corp.*, 108 P.3d 380, 387 (Idaho 2005)).  However, the right to discharge an at-will employee is limited by public policy considerations, such as when the motivation for the firing contravenes public policy.  *Van*, 512 P.3d at 991 (citing *Mallonee v. State*, 84 P3d 551, 557 (Idaho 2004)).  It is for the Court to decide as a matter of law what constitutes public policy sufficient to protect an at-will employee from termination.  *Van*, 512 P.3d at 991.  The public policy exception to the employment at-will doctrine has been held to protect employees who refuse to commit unlawful acts, who perform important public obligations, or who exercise certain legal rights and privileges.  *Id.*  If the discharge of an at-will employee would violate public policy, an employer may not do so without cause.  *Id.*  Once the court defines the specific public policy, the question of whether public policy was violated is submitted to the jury.  *Id.* (citing *Smith v. Mitton*, 104 P.3d 367, 374 (Idaho 2004)).

In this case, Hardenbrook's three breach of contract claims are based upon allegations that their discharge or demotion violated the public policy of encouraging employees to report potential federal safety violations committed by their employer.[5]  The hours of service

---

[4]  Although Hardenbrook did not concede at the hearing that the three plaintiffs were at-will employees, Count One of Hardenbrook's complaint alleges that the public policy exception to the at-will employment doctrine applies.  (Compl., Docket No. 1.)

[5]  This issue is not before the Court on Hardenbrook's Motion to Amend, and whether Plaintiffs have established a public policy sufficient to provide an exception to their at-will employment status is not definitively determined for purposes of the Motion to Amend.

**MEMORANDUM DECISION AND ORDER  - Page 12**

regulations presumably were implemented to ensure public safety such that employees are not driving commercial vehicles when they are fatigued.  UPS allegedly failed, and allegedly continues to fail, to keep records documenting when salaried employees drive commercial trucks, thereby preventing compliance monitoring with DOT hours of service regulations despite a comprehensive monitoring system used by full-time drivers.  Also, Hardenbrook asserts that each plaintiff was asked to drive a commercial vehicle after working in excess of the prescribed number of hours.

In order for Hardenbrook to prove his employment was terminated or that he suffered adverse employment consequences, he must first prove that the DOT hours of service regulations constitute an important public policy, and then link UPS's violations of the DOT hours of service violations and any cover up with the adverse employment consequences Plaintiffs suffered. *Crea v. FMC Corp.*, 16 P.3d 272, 276 (Idaho 2000).  As much as the parties argue the point, both issues are reserved for summary judgment or trial, and are not before the Court pursuant to Plaintiffs' motion to amend to add a claim for punitive damages.

By arguing the underlying merits of the dispute, the parties attempt to deflect the real concern for the Court, which is whether Hardenbrook has established a reasonable likelihood of proving facts at trial by clear and convincing evidence that UPS acted with an extremely harmful state of mind and extreme deviation from reasonable standards of business conduct when it terminated the employment of Gooch and Hardenbrook and demoted Orloff.  The harmful state of mind and unreasonable conduct must have been directed at the three plaintiffs, not toward the general public at large.  Thus, as much as Hardenbrook argues that UPS acted unreasonably in failing to prescribe controls to monitor hours of service violations with its salaried employees,

**MEMORANDUM DECISION AND ORDER  - Page 13**

that is not the issue.  On that point, UPS is correct when it argues that UPS's potential hours of service violations and lack of record keeping to monitor compliance is a red herring.  Breach of the underlying employment agreement alone is an insufficient basis for an award of punitive damages.

Instead, the Court must examine the circumstances surrounding the decision to terminate or demote the employees.  For example, in *Cuddy Mountain*, the court analyzed the actual decision to terminate the parties' contracts.  In that case, the parties were a general contractor and a concrete subcontractor.  There was no question that the general contractor had breached the seven-day written notice of termination requirement in the parties' contract.  But the court in *Cuddy Mountain* considered several other factors in making its decision.

First, the court examined whether the behavior of the defendant was oppressive in a business context.  *Cuddy Mountain*, 824 P.2d at 160.  In a contract case, there generally should be some element of outrage "similar to that usually found in the commission of crimes or torts done intentionally or with reckless indifference to the rights of the other party (*e.g.* fraud) or with an evil motive, (*e.g.* to vex, harass, annoy, injure or oppress) in conscious disregard of the rights of the injured person."  *General Auto Parts Co., Inc. v. Genuine Parts Co.*, 979 P.2d 1207, 1211-1212 (Idaho 1999).  Then, five other factors played a determinative role in deciding whether there was substantial evidence of an extreme deviation from standards of reasonable conduct:

> (1) the presence of expert testimony; (2) whether the unreasonable conduct actually caused harm to the plaintiff; (3) whether there is a special relationship between the parties, as in the *Garnett* insured-insurer relationship; (4) proof of a continuing course of oppressive conduct; and (5) proof of the actor's knowledge of the likely consequences of the conduct.

*Cuddy Mountain*, 824 P.2d at 160–161.

**MEMORANDUM DECISION AND ORDER  - Page 14**

The court found the decision to terminate was made "in an unprofessional manner," "conceived in frustration and consummated in anger" with no thought to the consequences. *Id.* at 158. The termination of the contract caused financial hardship resulting in the subcontractor's inability to pay its operating loan, and this was especially troubling to the court because the general contractor withheld payment due under the contract for work actually performed. *Id.* However, the most troubling aspect of the contract's termination was the post-termination revision of the daily work reports to include criticism of the subcontractor's work, which the court found was "adequate to establish a deviation from reasonable business conduct." *Id.* While the court found that the conduct was not as outrageous as that usually found in the commission of an intentional tort and that the case presented a close question, it ultimately decided that there was substantial evidence to indicate the defendant's actions were an extreme deviation from reasonable standards of business conduct, and held that the district court did not err in submitting the issue of punitive damages to the jury. *Id.* at 161.

In another construction contract case, the court found that the district court had abused its discretion in submitting the issue of punitive damages to the jury. *Eddins Construction, Inc. v. Bernard*, 806 P.2d 433 (Idaho 1991). In that case, the State of Idaho had entered into a contract with Seubert for the construction of a road. Seubert was required to obtain approval for subcontracting work, but failed to do so when it hired Eddins. Eddins discovered that Seubert had failed to obtain approval to subcontract the work. An additional conflict occurred when Seubert refused to honor an oral promise made by Seubert's job superintendent for an upward adjustment in Eddins's fixed bid contract to compensate for complications on the job. A breach of contract action ensued when Seubert terminated Eddins's contract.

**MEMORANDUM DECISION AND ORDER  - Page 15**

The court in *Eddins* first noted the absence of expert testimony regarding appropriate business conduct.  *Eddins*, 806 P.2d at 436.  Next, it found that Seubert's conduct resulted from a legitimate business dispute and that its conduct was neither unreasonable nor extreme.  The court found that Seubert's denial of its superintendent's authority to modify the agreement with Eddins was not evidence of an extreme deviation from a reasonable standard of conduct evidencing a harmful state of mind toward Eddins, but merely indicated that Seubert contested its superintendent's authority to make such contract modifications.  *Id.* at 437.  Also, the court found that Seubert's misrepresentations to the State of Idaho, while perhaps inappropriate toward the State of Idaho, did not indicate a harmful state of mind toward Eddins.  *Id.*  Next, the testimony that all public works contractors lie to the state about hiring subcontractors to avoid paying a worker's compensation premium on subcontracted labor, while again not appropriate, did not indicate a harmful state of mind toward Eddins.  *Id.*  And finally, the withholding of payment for three weeks did not constitute an extreme deviation from reasonable business standards because the failure to pay was not a continuing course of conduct resulting in substantial loss occasioned by the delay in payment.  *Id.*  Accordingly, the court held that the requisite standard for punitive damages had not been met.  *Id.*

In other contract cases, the determination hinges upon whether the plaintiff can prove that the defendant acted with outrage or an evil motive to specifically injure the plaintiff.  *See General Auto Parts Co., Inc.*, 979 P.2d at 1212 (denial of motion to amend for punitive damages appropriate because the plaintiff could not show that the defendant acted with a harmful state of mind when the defendant began expanding its auto parts business by selling to plaintiff's competitors in the absence of any non-competition clause); *compare Davis v. Gage*, 682 P.2d

1281, 1285–86 (Idaho Ct. App. 1984) (finding punitive damages award appropriate in breach of non-competition clause where defendant, among other things, tore down plaintiff's billboard advertising plaintiff's restaurant and opened a competing restaurant 200 feet from plaintiff's restaurant).  *See also O'Dell v. Basabe*, 810 P.2d 1082, 1102 (Idaho 1991) (finding the employer acted with a harmful state of mind by personally threatening the defendant during his termination meeting after the plaintiff had reported sexual harassment).

In analyzing UPS's actions in this case, Hardenbrook has not established a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages.  In looking at the cause of Hardenbrook's employment termination decision, at the time he was terminated his e-mails and computer usage were being monitored in response to the alleged insubordinate e-mails sent to division supervisors and managers.  It does not appear that Hardenbrook's BEQ responses caused the termination of his employment, since Mr. Moore did not confront Orloff about the BEQ response until July 13, 2006, but the actual request to terminate Hardenbrook's employment was from Ron Kenney, the Human Resources Manager, on July 11, 2006. Hardenbrook was purportedly terminated from employment for improper use of company equipment, discovered during the month of shadowing.  Hardenbrook complains that there was no investigation despite such a policy in the employee handbook, and that company policy permitted limited personal use of business equipment.

In looking at the *Cuddy Mountain* factors, Hardenbrook has not pointed to any facts to support a claim for punitive damages.   Hardenbrook argues that the pretextual reason for firing him—misuse of company equipment and derogatory e-mails—is contrived, thereby constituting an extreme deviation from reasonable standards of business conduct.  But the pretextual reason

**MEMORANDUM DECISION AND ORDER  - Page 17**

for firing Hardenbrook is properly considered as one of the elements of Hardenbrook's prima facie case.  Second, no expert testimony has been produced to establish whether shadowing an employee's e-mail and computer usage constitutes unreasonable business behavior.  No harm other than the loss of his job, the same harm complained of in the underlying cause of action for wrongful termination, occurred to Hardenbrook.  There was no special relationship present between UPS and Hardenbrook.

Hardenbrook also has not alleged facts showing a continuing course of oppressive conduct, such as falsification or alteration of his personnel file to include unjustified derogatory comments or public comments about his work performance such that Hardenbrook could not obtain other employment.  The mere deletion of Hardenbrook's BEQ response, without any adverse consequences suffered by Hardenbrook other than the loss of his job, is insufficient to meet the standard that the harmful state of mind must be directed at Hardenbrook rather than toward third parties who might discover the derogatory BEQ response.

The fact that UPS may be engaged in violating federal law, as in *Eddins*, does not indicate UPS harbored a harmful state of mind toward Hardenbrook.  While the evidence may establish a harmful state of mind toward the general public, it does not establish UPS's harmful state of mind toward Hardenbrook individually.  Other than a few comments to others that Hardenbrook needed to be "controlled," there is no evidence Hardenbrook suffered abuse or other outrageous conduct other than the loss of his job.  Hardenbrook simply recasts his causes of action, and points to UPS's behavior in violating the hours of service violations, in an attempt to argue punitive damages are warranted.  Hardenbrook cannot bootstrap the harm that resulted from the alleged violation of federal law and use it to prove malice toward him.  Hardenbrook

**MEMORANDUM DECISION AND ORDER  - Page 18**

has not alleged any facts that show UPS engaged in malicious, outrageous, oppressive, or fraudulent conduct directed at him other than the decision to terminate his employment and the alleged pretextual reasons for doing so.

The same is true for the facts surrounding the termination of Gooch's employment and the Orloff's demotion.  They allege that the reason for the adverse employment consequences they suffered in reaction to the time card irregularity investigation was pretextual.  Gooch and Orloff presented evidence by way of a few negative comments that suggest UPS was looking for a reason to fire or demote them.  That evidence would establish the pretextual nature of the adverse employment action, an element of their prima facie case, but that evidence does not establish oppressive, fraudulent, malicious or outrageous conduct directed at Gooch and Orloff. No expert testimony was presented on the issue of whether it would be wrong to terminate or discipline two long standing employees for their alleged superfluous role in the timecard issue. Again, other than the loss of their jobs, no other harm befell Gooch and Orloff.  No continuing course of oppressive conduct occurred.  Thus, Gooch and Orloff have not established by clear and convincing evidence that UPS had a harmful state of mind directed toward them and that UPS's conduct in firing them constituted an extreme deviation from reasonable standards of business conduct.

**B.     Motion to Strike Paragraphs Nine and Ten of the Proost Affidavit.**

In support of the motion to amend, Hardenbrook submitted the Affidavit of Jeff Proost. UPS moves to strike paragraphs nine and ten of the Affidavit on the basis that the two paragraphs lack proper foundation and evidence of personal knowledge of the facts stated therein.  (Mot. at 1, Docket No. 57.)  UPS objects based upon Fed. R. Evid. 602, which prohibits

**MEMORANDUM DECISION AND ORDER  - Page 19**

a witness from testifying to matters unless evidence is introduced sufficient to support a finding

that the witness has personal knowledge of the matter.  As explained below, the Court agrees and

will grant the motion to strike.

The two paragraphs UPS seeks to strike state as follows:

> 9.  In fact, based upon my experience, observations and communications during daily conference calls, I believe that it was understood by all management level employees within the Great Basin District that managers and supervisors were frequently violating D.O.T. hours of service regulations.  Specifically, during these conference calls, I would periodically mention that particular supervisors were delivering or "rescuing" packages while it was commonly understood that such supervisors were working in excess of 60 hours per week, especially during peak or the Christmas season.

> 10.  Based upon my experience in operations with UPS in California, the same applied in that D.O.T. hours of service regulations were being violated by managers and supervisors who were working in excess of 60 hours in a seven-day period.  In California it was also frequently discussed with division and district management personnel that district managers and supervisors were delivering while working in excess of 60 hours per week.

(Proost Aff., Docket No. 38).  Hardenbrook argues that Proost, because of his telephone calls

and experience in California, may make the inference that management understood the hours of

service regulations were being violated.

First, the Court did not rely upon Proost's statements in reaching its decision to deny the

motion to amend for punitive damages.  The statements are therefore irrelevant in the context of

Hardenbrook's motion to amend its complaint.  Second, even if the statements were relevant, the

Court agrees that Proost is not in a capacity whereby the personal knowledge he has—the

telephone calls to some unidentified management employees and his experience in

**MEMORANDUM DECISION AND ORDER  - Page 20**

California—places him in a position whereby he can infer what "all management level employees" at UPS knew.  In that respect, Hardenbrook's reliance upon *Barthelemy* is misplaced.

In *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990), the court determined that the affiants' personal knowledge and competence to testify could be reasonably inferred from their respective positions as chairman of the board and the nature of the other's participation as the chief negotiator on behalf of the airlines.  *Barthelemy* therefore stands for the proposition that a witness's competence and personal knowledge can be inferred based upon his position within the organization.  In other words, it is permissible to infer that because the witness is the head of a corporation, he or she is competent to testify and has knowledge of the corporation's business dealings by virtue of the person's position within the organization. *Barthelemy* does not, however, support the idea that an affiant's position within the organization qualifies him or her to testify and make a blanket statement about what "everyone" in management knew.  Moreover, the fact that Mr. Proost "believed" everyone knew because he had raised the issue with certain individuals and had discussions about the problem in California does not give rise to the inference that "all management levels" understood that the hours of service violations were being disregarded in Boise, Idaho.  The statement goes too far. Paragraphs nine and ten of the Proost Affidavit will be stricken.

**MEMORANDUM DECISION AND ORDER  - Page 21**

## <u>ORDER</u>

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS**

**HEREBY ORDERED that:**

1)      Plaintiffs' Motion to Amend Complaint to add a prayer for punitive damages

(Docket No. 37) is **DENIED**.

2)      Defendant's Motion to Strike paragraphs nine and ten of the Affidavit of Jeff

Proost (Docket No. 57) is **GRANTED**.



DATED: October 26, 2009

_____

Honorable Candy W. Dale
Chief United States Magistrate Judge