# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

DAREL HARDENBROOK, an individual,
PAUL GOOCH, an individual and
ROBERT ORLOFF, an individual,

      Plaintiffs,

vs.

UNITED PARCEL SERVICE, CO., a
Delaware corporation,

      Defendant.

Case No.  CV07-509-S-EJL

**MEMORANDUM ORDER**

## INTRODUCTION

Pending before the Court in the above entitled matter is the Defendant's Renewed Motion for Judgment as a Matter of Law and Alternative Motion for New Trial or to Alter or Amend the Judgment. (Dkt. No. 157.) The parties have fully briefed the motion and it is now ripe for the Court's consideration. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record.  Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motion shall be decided on the record before this Court without oral argument.

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs, Darel Hardenbrook, Paul Gooch, and Robert Orloff, initiated this action on November 2, 2007 by filing a Complaint in state court against the Defendant, United Parcel Service, Co. ("UPS"), alleging retaliation in violation of Idaho public policy, breach of contract, and breach of the implied covenant of good faith and fair dealing. (Dkt. No. 1, Att. 2.) On December 5, 2007, UPS removed the case to this Court on diversity grounds. (Dkt. No. 1.) The dispute between the parties relates to employment actions taken by UPS as to each of the Plaintiffs; Mr. Gooch and Mr. Hardenbrook were terminated and Mr. Orloff was demoted.

The Plaintiffs' complaint alleged that UPS' employment actions against them were made in retaliation to their inquiries regarding the Department of Transportation's ("DOT") hours of service regulations. (Dkt. No. 1, Att. 2, p. 2.) The DOT regulations prohibit drivers of commercial vehicles from driving if they have exceeded a specified number of work hours for a prescribed period of time. UPS denied the allegations and filed a Motion for Summary Judgment. (Dkt. No. 40.)

On December 8, 2009, this Court entered an Order granting in part and denying in part the Motion for Summary Judgment. (Dkt. No. 84.) The Court's Order dismissed all of Mr. Orloff's claims against UPS and dismissed two of the three claims raised by both Mr. Gooch and Mr. Hardenbrook. Eventually, Mr. Gooch's claims were resolved by the parties and only Mr. Hardenbrook's claim for

wrongful termination in violation of public policy remained. (Dkt. No. 97.) Thereafter, the parties filed Motions in Limine, Trial Briefs, Proposed Voir Dire, and related pretrial filings. The Court entered Orders on certain of the Motions in Limine. (Dkt. Nos. 118, 119, 123.) Trial began on January 12, 2010. The jury returned a Special Verdict on January 21, 2010 in favor of Mr. Hardenbrook awarding a total amount of damages of $1,476,367.00. (Dkt. No. 142.)

On March 4, 2010, UPS filed its Renewed Motion for Judgement as a Matter of Law and the parties each filed Memorandums, Declarations, Affidavits and other materials regarding the motions. Having reviewed these materials, the trial transcripts, and the entire record herein the Court finds as follows.[1]

## DISCUSSION

### 1.    Rule 50(b) Renewed Motion for Judgment as a Matter of Law

At the close of Mr. Hardenbrook's case in chief, UPS made a Rule 50(a) motion. The Court denied the motion and the case was submitted to the jury resulting in the verdict in favor of Mr. Hardenbrook. UPS now moves to renew its motion for a judgment as a matter of law pursuant to Rule 50(b).

### A.    *Legal Standard for Rule 50(b) Motion*

Motions for Judgment as a Matter of Law ("JMOL") and Alternatively Motion for New Trial are made pursuant to Federal Rule of Civil Procedure 50(b) which states:

---

[1]  In addition, both sides have filed Bills of Costs and a Motions for Attorney Fees which are referred to Chief Magistrate Judge Dale. (Dkt. Nos. 152, 153, 161, 162, 163, 184.) These motions will be ruled upon following the issuance of this Order.

If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

(1) allow judgment on the verdict, if the jury returned a verdict;

(2) order a new trial; or

(3) direct the entry of judgment as a matter of law.[2]

---

[2] Rule 50(a) states:

(a) Judgment as a Matter of Law.

(1) In General. If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

(2) Motion. A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

"Pursuant to Rule 50 of the Federal Rules of Civil Procedure, a court may grant a motion for judgment as a matter of law ("JMOL") against a party on a claim or issue where the party has been 'fully heard on [that] issue during a jury trial' and the court finds that a 'reasonable jury would not have a legally sufficient evidentiary basis' to find for that party." *Fungi Elec. Co., Ltd. v. Daewoo Electronics Corp.*, 593 F.Supp.2d 1088, 1092-93 (N.D. Cal. 2009) (citing Fed. R. Civ. P. 50(a) & (b)). "Where a party moves for JMOL in a case that has been tried to a jury, the court must determine whether 'there exists evidence of record upon which a jury might properly have returned a verdict in [the non-movant's] favor when the correct legal standard is applied.'" *Id.* (citations omitted). "The test is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002); *see also E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) ("The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.").

"[I]n entertaining a motion for judgment as a matter of law, the court ... may not make credibility determinations or weigh the evidence." *Go Daddy*, 581 F.3d at 961 (citation omitted). Rather, "[w]e must view the evidence in the light most favorable to the nonmoving party ... and draw all reasonable inferences in that party's favor." *Id.* (citation omitted). "We review a jury's verdict for substantial evidence in ruling on a properly made motion under Rule 50(b)." *Go Daddy*, 581

F.3d at 961.[3] "However, in ruling on a Rule 50(b) motion based on grounds not previously asserted in a Rule 50(a) motion, we are limited to reviewing the jury's verdict for plain error, and should reverse only if such plain error would result in a manifest miscarriage of justice." *Id.* (internal quotation marks and citation omitted). Plain error review "permits only extraordinarily deferential review that is limited to whether there was any evidence to support the jury's verdict." *Id.* at 961-62.

"Thus, the court must conduct two inquiries. First, the court must determine the correct law. Next, the Court must review the jury's factual findings to determine whether they are supported by substantial evidence." *Fungi Elec.*, 593 F.Supp.2d at 1092-93 (citations omitted). The jury's factual findings are given "substantial deference" and the legal standards the jury applies are considered *de novo* to determine, as a matter of law, whether the correct standards have been used. *Id.* (citations omitted).

---

[3] "A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion. Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury. If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b). Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Go Daddy*, 581 F.3d at 961 (citations and quotations omitted).

**B.    Analysis**

In this case, on his claim of wrongful termination in violation of public policy, Mr. Hardenbrook had the burden of proving each of the following by a preponderance of the evidence:

> 1.    the Plaintiff engaged in or was engaging in an important public obligation under state law, that is the reporting of violations, or potential violations, of federal Department of Transportation regulations;
>
> 2.    the Defendant subjected the Plaintiff to an adverse employment action, that is the termination of his employment with the Defendant; and
>
> 3.    the Plaintiff was subjected to the adverse employment action because he engaged in or was engaging in the important public obligation of reporting violations, or potential violations, of federal Department of Transportation regulations.

(Dkt. No. 143, Jury Instr. No. 32.) The jury was instructed that:

> Public policy considerations include where an employee is performing an important public obligation. In Idaho, reporting violations, or potential violations, of federal transportation regulations is an important public obligation falling within the public policy exception to the employment at-will doctrine.

(Dkt. No. 143, Jury Instr. No. 30.) UPS maintains the jury's verdict is not supported by the evidence presented at trial because there is no evidence that 1) Mr. Hardenbrook ever reported any DOT violations and 2) his termination was linked to any protected conduct. (Dkt. No. 157.) Mr. Hardenbrook counters that the evidence was sufficient to support the jury's findings. (Dkt. No. 173.)

### *(1)    Reporting DOT Violations*

As has been argued since the summary judgment phase of this case, the parties' dispute over whether Mr. Hardenbrook reported any DOT violations or potential violations revolves around the events beginning in December of 2005 and Mr. Gooch's emails sent to his superior, Brad Whitworth at the time. (Dkt. No. 84.) UPS argues Mr. Hardenbrook cannot rely upon Mr. Gooch's emails reporting the alleged violations but that it must be Mr. Hardenbrook's own conduct that reports such violations in order to invoke the public policy exception. (Dkt. No. 189, p. 2.) The Court agrees.

The issue of whether the conduct in question violates public policy is a question for the jury. *See Thomas v. Medical Center Physicians, P.A.*, 61 P.3d 557, 564 (Idaho 2002). "In order for the public policy exception to apply, the discharged employee must: (1) refuse to commit an unlawful act; (2) perform an important public obligation; or (3) exercise certain rights or privileges." *Thomas*, 61 P.3d at 564 (emphasis added). Based on the emphasized language in *Thomas*, the Court finds the public policy exception can only apply to Mr. Hardenbrook's claims where he performed an important public obligation; to-wit reporting violations or potential violations of DOT regulations.[4]

---

[4] The Idaho Supreme Court has considered, but not decided, whether a cause of action for wrongful termination in contravention of public policy can be based upon conduct of the employee's spouse. *Edmondson v. Shearer Lumber Products*, 75 P.3d 733, 739 (Idaho 2003). There the court did not have to resolve the question because the evidence did not support the claim regardless of whether it was the employee's own conduct or that of his spouse. However, the court cited to *Bammert v. Don's Super Valu, Inc.*, 646 N.W.2d 365, 370 (Wis. 2002) which refused to enlarge the narrow public policy exception to include claims of wrongful terminations for conduct outside of the

Mr. Hardenbrook argues the evidence shows Mr. Gooch's email was prompted by his conversations with Mr. Gooch and that the email encompassed Mr. Hardenbrook's concerns about possible DOT violations. (Dkt. No. 173.) Mr. Hardenbrook also points to his actions subsequent to the email that, he argues, reflects his involvement in and knowledge of the email reporting alleged violations. In particular, Mr. Hardenbrook's telephone conversation with Mr. Whitworth subsequent to the email, he argues, is a report of violations or potential violations and evidence that he and Mr. Gooch were in communication about the emails between December 17 and 22. During his phone call with Mr. Whitworth, Mr. Hardenbrook argues he accepted responsibility for the emails and told Mr. Whitworth that he had asked Mr. Gooch to seek clarification regarding the DOT regulations. Because he was involved in the conception of the email and later took responsibility for the email, Mr. Hardenbrook contends there was evidence upon which the Jury could find he had engaged in a public obligation of reporting alleged or potential DOT violations.

Asking or talking to Mr. Gooch about possible DOT violations, UPS counters, does not amount to a performance of an important public obligation invoking the public policy exception. Nor do Mr. Hardenbrook's subsequent actions.

In reviewing the evidence in this case, the Court finds there is evidence in the record to support the jury's verdict. Mr. Gooch's December 2005 emails to Mr.

---

employment relationships by someone other than the discharged employee.

MEMORANDUM ORDER - 9

Whitworth could be considered "reports" invoking the public policy exception as to Mr. Gooch. Mr. Hardenbrook and Mr. Gooch both provided testimony that they had discussed the issue of the DOT regulations and that Mr. Hardenbrook's inquiries prompted Mr. Gooch to send the email to Mr. Whitworth. The fact that Mr. Hardenbrook knew of or instigated the sending of these emails, however, does not constitute a "report."

Mr. Hardenbrook's subsequent phone calls to Mr. Whitworth about the emails may be evidence of a "report." In making this determination, the Court views "the evidence in the light most favorable to the nonmoving party ... and draw all reasonable inferences in that party's favor. The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Go Daddy*, 581 F.3d at 961 (citation omitted).

In this case, after Mr. Gooch sent his emails to Mr. Whitworth, Mr. Hardenbrook called Mr. Whitworth on December 31, 2005 and testified that he took responsibility for the emails that discussed the DOT regulations. Jury Instruction number 31 advised the jury that "[a]n employee who makes a report that is protected under the public policy exception is protected by reporting the conduct to superiors within the company." (Dkt. No. 143.) Thus, the Jury here had evidence upon which it could find that Mr. Hardenbrook reported violations or potential violations of DOT regulations during this phone call. There is testimony from both Mr. Gooch and Mr. Hardenbrook that indicates Mr. Hardenbrook was aware of the emails prior to his telephoning Mr. Whitworth. This knowledge

coupled with Mr. Hardenbrook's testimony taking responsibility for the emails in his conversation with Mr. Whitworth is evidence supporting the Jury's verdict that Mr. Hardenbrook reported violations or potential violations of DOT regulations. Though UPS disputes this theory of the case, the evidence is viewed in the light most favorable to Mr. Hardenbrook. The Motion is denied on this basis.

### (2) *Termination Linked to Protected Conduct*

UPS next argues the managers who made the termination decision, Mr. Moore and Mr. Kenney, did not connect Mr. Hardenbrook to Mr. Gooch's December 2005 emails reporting alleged violations of DOT regulations. (Dkt. No. 157, p. 5.) Thus, UPS contends, the evidence does not show that Mr. Hardenbrook's termination was linked to any protected conduct falling within the public policy exception. UPS asserts that the evidence shows that just weeks after the December 2005 emails were sent, Mr. Hardenbrook was "rewarded" with an assignment to UPS's Workplace Flexibility Committee, of which Mr. Moore and Mr. Kenney were co-chairs. The termination was instead, UPS contends, a result of Mr. Hardenbrook's alleged unprofessional and insubordinate behavior.

Mr. Hardenbrook counters that the evidence showed both Mr. Kenney and Mr. Moore were aware that he was involved and supported Mr. Gooch's December 2005 emails and disputes that they had anything to do with his appointment to the Workplace Flexibility Committee; arguing instead that his involvement in the committee served only to provide pretextual reasons for his termination. In particular, he points to Mr. Kenney's testimony where he stated that Mr.

Whitworth had told him about Mr. Hardenbrook's involvement in the December 2005 emails. (Dkt. No. 173, p. 7) (citing Kenney Test., P. 34, line 16 - p. 35, line 4.) Finally, Mr. Hardenbrook cites the evidence regarding his BEQ response which revealed his involvement with the December 2005 email reports of alleged violations of DOT regulations. It was this response which, he argues, prompted Mr. Moore and Mr. Kenney's decision to terminate him and any other stated reason was pretextual.

The Court finds there is evidence in the record, when construed in the light most favorable to Mr. Hardenbrook, upon which the Jury was able to find as they did in reaching their verdict. *See Go Daddy*, 581 F.3d at 961. The Jury's finding that the decision to terminate Mr. Hardenbrook was based on his report of actual or potential violations of DOT regulations is supported by the testimony of various witnesses regarding what was known of Mr. Hardenbrook's involvement with the December 2005 emails by Mr. Kenney and Mr. Moore. In particular, there was evidence that Mr. Whitworth had told Mr. Kenney about Mr. Hardenbrook's involvement with the December 2005 emails. Further, the testimony and evidence regarding Mr. Hardenbrook's placement on the Workplace Flexibility Committee and his BEQ responses can be construed either way such that this Court cannot say, having construed the evidence in the light most favorable to the non-moving party, that a "reasonable jury would not have a legally sufficient evidentiary basis' to find for that party." *Fungi Elec.*, 593 F.Supp.2d at 1092-93.

### *(3)    Conclusion*

Based on the foregoing, the Court cannot say "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d at 1010; *see also Go Daddy*, 581 F.3d at 961. From the time of the pretrial motions through the trial, the Court has perceived these questions to be close calls which could only be resolved by the finder of fact who must weigh the credibility of the witnesses and evidence. Such credibility and weighing determinations are not for this Court to second guess on this motion. *See Go Daddy*, 581 F.3d at 961("[I]n entertaining a motion for judgment as a matter of law, the court ... may not make credibility determinations or weigh the evidence."). Rather, the Court "must view the evidence in the light most favorable to the nonmoving party ... and draw all reasonable inferences in that party's favor." *Id.*

Applying this standard here, the Court finds there was evidence offered at trial upon which the jury could properly have returned their verdict on the liability issue in favor of Mr. Hardenbrook, the non-movant, when the correct legal standard is applied. *Fungi Elec.*, 593 F.Supp.2d at 1092-93. The testimony and evidence regarding Mr. Hardenbrook's discussions with Mr. Gooch and Mr. Whitworth about potential and alleged violations of the DOT regulations and his purported involvement in the emails sent by Mr. Gooch in December of 2005, when viewed in favor of the non-moving party, is evidence upon which the Jury

could conclude that Mr. Hardenbrook had reported such potential and alleged violations. Likewise, there was testimony upon which the Jury could have found that the UPS managers who made the decision to terminate Mr. Hardenbrook, Mr. Kenney and Mr. Moore, knew of the reports regarding the potential and alleged violations of the DOT regulations and fired Mr. Hardenbrook because of them. As such, the Court denies the Rule 50(b) Motion for a Judgment as a Matter of Law.

## 2. Rule 59(a) Motion for New Trial

In the alternative to a judgment as a matter of law, UPS seeks a new trial pursuant to Rule 59(a). Pointing to the front pay damage awarded by the jury in this case, UPS argues such award is not supported by the evidence, grossly speculative, and a new trial is warranted. (Dkt. No. 157, p. 7.)

### A. *Legal Standard for Rule 59(a) Motion*

"Even where the court finds that JMOL is not appropriate, it may order a new trial under Rule 59 of the Federal Rules of Civil Procedure. Rule 59 provides that a court may, following a jury trial, order a new trial 'for any reason for which a new trial has heretofore been granted in an action at law in federal court.'" *Fungi Elec.*, 593 F.Supp.2d at 1093 (quoting Fed. R. Civ. P. 59(a)(1)(A)). "Historically recognized grounds include but are not limited to claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Id.* (citation and quotations omitted). "The Ninth Circuit has held that a new trial may be granted 'only if the verdict is contrary to the clear weight of the evidence, is based upon false or

perjurious evidence, or to prevent a miscarriage of justice.'" *Fungi Elec.*, 593 F.Supp.2d at 1093 (citation omitted). "In contrast to JMOL motions, in determining whether a verdict is contrary to the clear weight of the evidence, the court 'has the duty ... to weigh the evidence as [the court] saw it' and may set aside the verdict even if it is supported by substantial evidence." *Id.* (citation and quotations omitted).

### B. Analysis

The Jury in this case returned a special verdict awarding back pay in the amount of $40,000 and front pay in the amount of $1,436,367. (Dkt. No. 142.) The front pay amount represents the total calculated by Plaintiff's expert in Scenario 2 of Exhibit 280 for all twenty-seven years of Mr. Hardenbrook's work-life minus the $40,000 in back pay the Jury awarded. Mr. Hardenbrook contends the Jury's verdict and amount of damages are not against the clear weight of the evidence and, in fact, are supported by substantial evidence. (Dkt. No. 173, p. 10.) Mr. Hardenbrook argues state law controls this issue and the Idaho Supreme Court allows front pay damages. Further, he states that this Court must give substantial deference to the Jury's finding as to the appropriate amount of damages.

UPS presents four "independent reasons" this award warrants a new trial or remittitur: 1) evidence at trial showed Mr. Hardenbrook was going to leave UPS negating any award of front pay; 2) the promotion-based pay increase assumption in Scenario 2 is based on pure speculation; 3) the assumptions in Scenario 1 are speculative and not the proper basis for any front pay damages award; and 4) the

Jury's front pay damage award was punitive in nature. Mr. Hardenbrook disputes UPS's characterization of the evidence asserting instead that 1) he was not likely to leave his employment at UPS; 2) neither Scenario 1 or 2 were based on speculation; 3) the stock values were not significantly overvalued; and 4) there is no evidence that the Jury's award was punitive.

### C.     Conclusion

In this case, the Court cannot say that the jury's verdict as to UPS's liability "is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or [a new trial is necessary] to prevent a miscarriage of justice.'" *Fungi Elec.*, 593 F.Supp.2d at 1093. This Court, in determining whether a verdict is contrary to the clear weight of the evidence, has weighed the evidence as it saw it. *Id.* Though the Court may set aside the Jury's verdict on liability even if it is supported by substantial evidence, the Court declines to do so here. *Id.* The verdict itself is not contrary to the clear weight of the evidence. The evidence and testimony painted a picture of the events leading up to the employment dispute in this case which could be viewed in a number of ways depending on the weight and credibility given to each. If ever there were a case turning on disputed facts, it is this case. The parties have diametrically opposite views of the events which they each presented to the jury. The truth surrounding these events likely lies somewhere in the middle. Simply put, in its own view of the testimony and evidence, the Court does not find the jury's verdict of liability "is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or [a new

trial is necessary] to prevent a miscarriage of justice.'" *Fungi Elec.*, 593 F.Supp.2d at 1093.

The arguments presented on this motion are a continuation of those presented in the pretrial motions and at trial. Whether Mr. Hardenbrook intended to leave his employment with UPS, the value of damages in terms of possible promotions and stock if he were to have stayed at UPS, and that the front pay award was punitive are all arguments disputing the weight and credibility to be given to evidence and testimony offered at trial. There was testimony at trial going both ways on each of these issues raised in UPS's motion that could, depending on how the finder of fact viewed it, support either side's argument. Ultimately it appears the Jury found the Plaintiff's case to yield more weight than that of the defense. The Court's own view of the evidence does not find the Jury's verdict here to be contrary to the clear weight of the evidence, based on false or perjurious evidence, or a new trial is necessary to prevent a miscarriage of justice. *See Fungi Elec.*, 593 F.Supp.2d at 1093.

Pointing to the Jury's award of $40,000 in back pay, UPS maintains that award indicates the Jury's finding that Mr. Hardenbrook intended to leave his employment in 2006. From this, UPS opines that the Jury's front pay award "was meant to punish UPS." (Dkt. No. 157, p. 17.) Mr. Hardenbrook argues this conclusion is speculative and maintains the Jury's damages awards are supported by and based upon the testimony and evidence offered at trial. The Court agrees. The lone fact that the Jury awarded back pay in an amount equal to that proposed

by the defense and then awarded front pay in the amount of that proposed by the plaintiff does not then mean the Jury's verdict was punitive in nature.[5] As such, the Motion for a New Trial under Rule 59(a) is denied. The amount of the damages award, however, requires a different result which the Court will discuss below.

**3.     Rule 59(e) Motion to Alter or Amend Judgment (Remittitur)**

Finally, UPS asks that the Court evaluate the evidence from the trial and grant a remittitur based on that evidence and, then, offer Mr. Hardenbrook the choice of accepting the remittitur or proceeding to a new trial.

**A.     *Legal Standard for Rule 59(e) Motion***

A jury's finding on the amount of damages will be upheld unless the amount is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guess work." *Del Monte Dunes at Monterey, Ltd. v. Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996); *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1191 (9th Cir. 2002) (citation omitted). Thus, the damages award must be affirmed unless it is "shocking to the conscience." *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988); *see also Fungi Elec.*, 593 F.Supp.2d at 1093 ("An award of damages may be set aside where it is 'grossly excessive or monstrous, clearly not supported by the evidence or based only on speculation or guesswork.'").

---

[5] Punitive damages are damages awarded in addition to actual damages to punish the defendant who acted in a certain manner. *See* Black's Law Dictionary 448 (9th Ed. 2009).

"Generally, a jury's award of damages is entitled to great deference, and should be upheld unless it is clearly not supported by the evidence or only based on speculation or guesswork." *In re First Alliance Mortgage Co.*, 471 F.3d 977, 1001 (9th Cir. 2006) (internal quotation marks omitted); *see also Del Monte Dunes*, 95 F.3d at 1434-35. In making this determination, the Court considers the evidence in a light most favorable to the prevailing party. *See Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983). "Where the court determines that a damage award is excessive, the court may either grant the motion for a new trial or deny the motion conditional on the plaintiff accepting a remittitur, that is, agreeing to...a lesser amount of damages that the court considers justified. The proper amount of a remittitur is the maximum amount sustainable by the evidence." *Fungi Elec.*, 593 F.Supp.2d at 1093 (citations and quotations omitted).

### B.    Analysis

As stated previously, the Jury in this case awarded Mr. Hardenbrook back pay in the amount of $40,000 and front pay in the amount of $1,436,367 for a total damages award of $1,476,367. (Dkt. No. 142.) UPS contends this award amount is excessive and argues the appropriate award, if any, should be five years of front pay, including five years of each of the following: future lost wages, RSU grants, pension benefits, and retiree healthcare for a total damages award of $57,725.

(Dkt. No. 157, p. 18.)[6] Mr. Hardenbrook maintains the Jury's damages award was supported by the evidence offered at trial and should be upheld.

Plaintiff's expert witness, Dennis Reinstein, opined that over the course of Mr. Hardenbrook's work-life, the Battery Systems position wages and benefits would be less than if he had remained at UPS for his entire career. Mr. Reinstein submitted an illustrative exhibit which details two scenario's of estimated losses incurred as a result of Mr. Hardenbrook's termination from UPS. (Pl.'s Ex. 280.) Scenario 1 assumes Mr. Hardenbrook would not have received a promotion at UPS were his employment to have continued. Scenario 2 assumes Mr. Hardenbrook would have received a large promotion at UPS in 2016 which significantly increases the loss amounts. Each scenario is calculated for varying periods of time over which Mr. Hardenbrook could have worked at UPS starting from his date of termination then going forward nine years, eighteen years, and finally his "entire work life" ending in 2037. For each time period, the scenarios incorporate: 1) value of past lost wages and benefits, 2) present value of future lost wages and benefits, 3) present value of restricted stock unit grants, 4) present value of defined benefit plan, 5) present value of retiree healthcare, and 6) present value of retiree healthcare for spouse. The total values for Scenario 1 ranged from $315,987 to $673,169. The total values for Scenario 2 ranged from $412,637 to $1,476,367.

---

[6] The specific calculation provided by UPS is: $15,574.00 in front pay, $42,151 in RSU grants, $0 pension benefits, and $0 in retiree healthcare benefits. (Dkt. No. 157, pp. 18-19.)

Defendant's expert witness, Cornelius Hofman, also provided illustrative exhibits. (Def.'s Exs. 556, 557.) Exhibit Number 556 details his estimates of economic losses at the present value of wages and benefits for each year from the date of Mr. Hardenbrook's termination, July 25, 2006, to January 1, 2037. This Exhibit arrives at a cumulative present value for each year taking into account: 1) UPS wages, 2) UPS benefits, 3) work life and unemployment adjustment, 4) UPS earnings, 5) mitigating wages, 6) mitigating benefits, 7) mitigating earnings, 8) the difference, and 9) the present value of the difference. (Def. Ex. 556.) Exhibit 556, Mr. Hofman testified, is "essentially Mr. Reinstein's table with a couple very small corrections" and done in a year-by-year basis. Mr. Hofman's "corrections" include 1) an increase in the percentage of benefits associated to the Battery System's job from eight to ten percent; 2) the work life expectancy factor should account for two percent of potential down time due to unemployment; and 3) present value adjustment should be half a percent instead of the 1.5 percent used by Mr. Reinstein. (Hofman Test.) The main differences between the two reports have to do with the unemployment adjustment, the difference between UPS earnings and expected mitigated earnings, and the present value adjustment.

The Jury ultimately awarded $1,476,367 in total damages which is the highest figure calculated in Mr. Reinstein's Scenario 2. Having considered all of the evidence and testimony presented in this case and for the reasons stated herein, the Court finds the award of $1,476,367 in damages in this case to be "grossly excessive or monstrous" and "clearly not supported by the evidence." *Fungi Elec.*,

593 F.Supp.2d at 1093. Mr. Hardenbrook is a healthy 38-year-old man with two college degrees, eleven-plus years of experience at UPS, and three additional years of experience at his current job with Battery Systems. (Dkt. No. 224 and Collins Test.) Since his termination from UPS, Mr. Hardenbrook has secured new employment at Battery Systems, Incorporated making a comparable salary to what he was making at UPS.[7] (Collins Test.) This new position also provides benefits, a 401(k), a company car, and requires fewer weekly hours than his job with UPS.[8] For these reasons and upon the analysis to follow, the Court will issue a remittitur as detailed below.

### (1) Plaintiff's Expert's Scenario 2

At trial, UPS objected to the admission of Exhibit 280. In particular, the inclusion of Scenario 2 arguing it was based on hearsay and speculative because it improperly presumes Mr. Hardenbrook would have received a promotion at all, let alone when such promotion would materialize and the amount of any promotion. The Court allowed Exhibit 280, including Scenario 2, to be offered only for

---

[7]After his termination, Mr. Hardenbrook testified he used four headhunters, online avenues, and other personal contacts to find a new job. In the process submitting in excess of 100 job applications. After his July 24, 2006 termination he started working at Costco Wholesale as a part-time stocker in April of 2007 making $12 per hour. The first 6 months no benefits. He worked at Costco until January of 2008 when he went to work at Battery Systems, Incorporated.

[8]In his first year at Battery Systems he made a salary of $60,000 as a salesperson and was paid roughly $500 a month for healthcare and dental. As a salesperson he had no retirement benefits or stock ownership. On February 10, 2009, he became the branch manager of southern Idaho which increased his salary to $72,000 per year and he received an additional $100 a month for healthcare and dental. His work week is 40 to 45 hours.

illustrative purposes so that Mr. Reinstein could explain and offer his opinion.[9] Thereafter, Mr. Hofman and others testified regarding certain of the assumptions upon which Scenario 2 was based. In now viewing the totality of the evidence offered at trial, the Court finds Scenario 2 to be based on speculation and assumptions not supported by the evidence in the record.

As UPS's expert opined, Scenario 2 is a one-in-a-million possibility and not within a reasonable view of economic certainty. In particular, the assumptions underlying the scenario that Mr. Hardenbrook would get a promotion in a certain year and that it would be a 40 plus percent promotion is only based on speculation. UPS points to Mr. Hardenbrook's own testimony which raised serious questions about whether he intended to remain at UPS and whether, if offered, he would have accepted a promotion that required him to move until after his children were out of school.

Mr. Hardenbrook counters that Scenario 2 is supported by the evidence that was offered at trial including Mr. Hardenbrook's testimony that when he removed his name from the promotions list he inquired about whether he would be able to put his name back on the list after his children had finished school. Scenario 2, Mr. Reinstein testified, takes into account Mr. Hardenbrook's desire to wait on any promotion until his children had completed school by moving the date of any such promotion out to 2016 when his children would have completed their

---

[9] At the time the Court admitted the exhibit, the evidence had not been admitted in its entirety. Thus, allowing the Plaintiff's expert to opine regarding his findings was proper in the context and at the time of the trial.

schooling. Mr. Hardenbrook also points to the testimony of others at UPS who stated that UPS only promoted from within the company and that there were several promotional opportunities at UPS. The Court, having the benefit of viewing the testimony as it was offered and now having reviewed the same, finds Scenario 2 necessitates believing many levels of speculation and assumptions regarding: whether or not Mr. Hardenbrook would have remained at UPS, been offered a promotion, when such an offer would have been made, if Mr. Hardenbrook would have accepted the offer, and the amount of such a promotion. The evidence does not support such findings.

Mr. Hardenbrook's own testimony was that he was unsure whether he would accept a promotion at this time, had asked that his name be removed from the list of possible candidates, and that he was contemplating leaving UPS or at least exploring the possibility to some extent. Mr. Hardenbrook testified that he asked Rich Hansen, the Idaho division manager, to pull his name off the promotion list in early 2005, or late 2004 because his kids were just entering school and he didn't want to relocate until his kids were older. He testified that he intended to put his name back on the list after his kids graduated from high school. His understanding was that he would be put back on the list as an "A" candidate. Such testimony goes to show what Mr. Hardenbrook's own thoughts were regarding his career path but do not yield evidence supporting the assumption that he would be promoted at all let alone that it would be in 2016 or that he would still be working at UPS in 2016. Nor was there any evidence about what the amount of such a

promotion would be if it were offered and if Mr. Hardenbrook were to have accepted at that time.

Although opinion testimony valuing future losses requires some level of reasonably based assumptions, the Court finds the assumptions here upon which Scenario 2's calculations are based are too speculative. The testimony and evidence in the record do not support the promotion assumptions upon which Scenario 2 is based without requiring the finder of fact to engage in improper guessing and speculation. Scenario 2's prediction of a significant promotion at an arbitrary date in the future is without supporting evidence. The testimony from both sides reveals that Mr. Hardenbrook's future at UPS was uncertain. Mr. Hardenbrook was an at will employee with UPS and had applied for two other jobs outside of UPS. The Court finds the values in Scenario 2 are without evidentiary support. Because the amount of the Jury's damages award is obviously based on Scenario 2, the Court concludes the Jury's award must be set aside as it is grossly excessive and clearly not supported by the evidence and based only on speculation. As such, the Court will either grant UPS's motion for a new trial or deny the motion conditioned on Mr. Hardenbrook's accepting a remittitur in the amount the Court has determined to be justified and sustainable by the evidence presented at trial as detailed below.

### (2) *Remittitur*

Having concluded the amount of the Jury's damages award in this case is grossly excessive, not supported by the evidence, and based on speculation, the

Court will now detail the damages amount justified by the evidence as presented at trail. As stated above, Scenario 2's fundamental assumption that Mr. Hardenbrook would be promoted in 2016 at a 40 percent increase in salary is too speculative to be considered. Therefore, the Court will not weigh the amounts from Scenario 2 in its damages calculation. The Court will discuss below the differing opinions of the parties' experts regarding the damages calculations in arriving at the amount of the remittitur.

### (a)     Years of Employment at UPS

Plaintiff's expert, Mr. Reinstein, calculated damages for nine years, eighteen years, and twenty-seven years or until Mr. Hardenbrook is 66 years old in the year 2037. UPS's expert, Mr. Hofman, calculated damages annually for every year starting from the date of termination through 2037. UPS maintains Mr. Hardenbrook was applying for jobs and was anticipating leaving his employment at UPS so the estimated future losses, if any, should not extend for his entire career; or until 2037. Mr. Hardenbrook counters that his damages should be calculated as if he worked his entire career at UPS because he intended to remain at UPS for his entire career because of the salary, benefits, and promotional opportunities available to him at UPS.[10]

This determination turns in large part on Mr. Hardenbrook's testimony at trial and the credibility to be given to his testimony. In his testimony, Mr.

---

[10] Mr. Hardenbrook testified that UPS only promoted from within the company and that he was attracted to UPS because of the better wage/salary, stock options, healthcare, pension, retirement, and other benefits.

Hardenbrook detailed the many jobs he had at UPS from the time he started until around 2005 when the events in question here occurred.[11] Mr. Hardenbrook testified that in 2006 he prepared a resumé and, in May, submitted applications to both Simplot and Idaho Power. (Pl.'s Exs. 32, 224.) He explained that the reason he'd applied for the non-UPS jobs was that "had to put my feelers out there" because he was frustrated with the current management. He testified he had applied for two other positions in the eleven years he'd worked at UPS. He admitted that he and another UPS employee had talked about exploring job opportunities outside of UPS for four years but that he had not actually applied for any other positions until May of 2006. He testified he updated his resumé prior to his termination from UPS in anticipation of applying for the positions at Simplot and Idaho Power. He testified that he submitted these applications because he was concerned about what had happened in December of 2005. He was fired on July 24, 2006. This testimony seems to suggest that on some level Mr. Hardenbrook was exploring job opportunities outside of UPS or was concerned about his continued employment at UPS given the management was unlikely to change and even if Plaintiff had been kept on at UPS, the evidence shows there were uneasy

---

[11]Mr. Hardenbrook testified that he began working at UPS in May of 1995 as a part-time unloader on the "preload" in Boise, Idaho. He was promoted to a part-time supervisor and held various other positions in UPS until 1999 when he became a full-time package driver for a few months and then was promoted to a full-time specialist position. In January of 2000 he was promoted to on-road supervisor and held various other full-time management positions thereafter until his termination in 2005 when he was a package dispatch supervisor in the Nampa, Idaho center. As a package dispatch supervisor, Mr. Hardenbrook testified he essentially held three positions as: a package dispatch supervisor, reload supervisor, and an on-road supervisor.

feelings between management and Mr. Hardenbrook. He also testified that he turned down a callback from Simplot which indicates either the Simplot job was not what he was looking for or that he had decided to remain at UPS. Mr. Hardenbrook did testify in July of 2006 he did not have any intention of quitting at UPS and that his intention was to remain at UPS for his entire career. At the very least the evidence shows Mr. Hardenbrook was conflicted about his future at UPS.

Having been privy to the evidence offered at trial and having again reviewed the transcript of the testimony and evidence, the Court finds the evidence supports the Jury's finding that Mr. Hardenbrook's intention was to remain at UPS for his entire career. Though he did apply for other positions during a time of frustration at UPS, such an exercise seems reasonable given the circumstances surrounding Mr. Hardenbrook's employment at UPS in late 2005 and early 2006. The fact remains that most UPS employees remain with UPS for their entire work life because of the salary, benefits, and promotional opportunities UPS offers to its employees. Likewise, the Court finds the calculations that Mr. Hardenbrook's work-life would extend to the year 2037 is reasonable.

### (b) *Comparability of Mr. Hardenbrook's Jobs*

Plaintiff's expert testified that Mr. Hardenbrook's job at UPS was not comparable to the job he has at Battery Systems. UPS's expert, Mr. Hofman, challenged this testimony opining that any losses Mr. Hardenbrook suffered as a result of losing his UPS job were mitigated by the Battery Systems job.

### *(I)      Work Hours*

The hours Mr. Hardenbrook worked at UPS were greater than at his Battery System's job. Mr. Hardenbrook testified that during non-peak hours at UPS he worked on average between 60 and 75 hours a week and worked even more hours in the peak times of the year. At Battery Systems, Mr. Hardenbrook stated he works an average of 40 to 45 hours a week. Because his salary is nearly the same at both jobs, Mr. Hofman opined that beyond the year 2008 the tables are "nonsense" because the UPS job and the Battery Systems job were not comparable given the difference in the number of hours worked and the salary for each position which are not accounted for in the estimates provided by Mr. Reinstein.

The Court agrees the work hours required of Mr. Hardenbrook at UPS were far greater than those at Battery Systems. However, the value of this difference was not quantified at trial. Instead, Mr. Hofman only testified about the failure of Mr. Reinstein's calculation to account for the difference and that it was improper to assume the two positions were comparable.[12] Thus, there is no evidence upon which to value the difference. Further, Mr. Hardenbrook's salary at Battery Systems was comparable, but not equal, to his pay at UPS. Mr. Hardenbrook testified that his starting salary at Battery System's was roughly $60,000 and by 2009 he was making $72,000 per year. In 2004, Mr. Hardenbrook's UPS taxable

---

[12] Mr. Hofman did testify that to account for the difference in hours between the two jobs it would only take nine or ten hours at a minium wage job to mitigate or make up that difference and the damages should be "truncated" to account for that. This testimony still has not quantifiable basis upon which the finder of fact could rely and to simply "truncate" the damages would be arbitrary and without any evidentiary basis.

salary was $61,729 and his total direct pay was $78,532. (Pl.'s Ex. 225.)[13] Accordingly, the Court agrees with the Jury's determination in regards to this argument. There is simply no evidence upon which to value or quantify the difference in hours between the two jobs.

### (ii)    *Advancement Opportunities*

Mr. Hofman also testified that the assumptions in Scenario 2 do not account for the fact that Mr. Hardenbrook could obtain promotions in his new job. Thus if one is to assume Mr. Hardenbrook would receive a promotion at UPS in 2016 one must necessarily assume the same fact would be true in his new employment and include that in calculating the mitigating wage; the failure to do so is unfair and not economically justifiable. The Plaintiff countered with testimony that UPS gave frequent merit and annual increases in wages but Battery Systems did not and, therefore, the UPS income reflected in Scenario 2 appropriately was grown faster than that for Battery Systems.

Mr. Hofman disagreed that the UPS income should be grown faster than Battery Systems and further countered that his criticism of Scenario 2 is that based on Mr. Hardenbrook's age, training, and experience he would be able to receive merit based increases in his mitigation wage that should have been included in the calculation of the Battery System salary. Thus, he testified, it was biased for Scenario 2 to increase the UPS salary by forty percent for a projected promotion but have no increase to the Battery System's salary for any possible promotions.

---

[13] Mr. Hardenbrook's total compensation as of December 31, 2004 was $96,990 which included $78,532 in direct pay and $18,458 in indirect pay. (Pl.'s Ex. 225.)

The fact that Mr. Reinstein's estimates do not provide for promotions at Battery Systems but do include value increases based on promotions at UPS is supported by the evidence in the record. Several witnesses testified about UPS's promotional opportunities. Though in the cross-examination of Mr. Reinstein, the defense raised questions about the failure to value possible promotions at Battery Systems, Mr. Hardenbrook soundly rebutted the defense's claim that it was unfair for the wages at Battery Systems to not take into account possible promotions.[14] Based on the evidence presented, it was appropriate for Mr. Reinstein not to include the possibility of promotions a Battery Systems. That being said, as stated above, the Court still does not find there is evidence to support Mr. Reinstein's promotional assumptions as is contained in Scenario 2. As such, any error in Mr. Reinstein's failure to include possible advancements for Mr. Hardenbrook at Battery Systems is corrected by the Court's ruling regarding Scenario 2.

---

[14]     Mr. Hardenbrook offered the testimony of Mr. Reinstein, himself, and Mr. Jeffrey Proost that the Battery Systems job does not offer the same salary, benefits, and promotional opportunities as were available to Mr. Hardenbrook at UPS. There was testimony at the trial offered by Jeffrey A. Proost that Battery Systems does not give annual increases or inflationary increases and that the only way for employees to increase their paycheck is through various bonus programs such as if a branch exceeds a targeted number, they are eligible to split up a percentage of that over the target number. He also testified that Mr. Hardenbrook is eligible for medical benefits, a dental program, vision program, company car, and a matching 401(k) at Battery Systems. No stock options or retiree benefit programs. The 401(k) program is a $2,000 match by the company annually. Mr. Hardenbrook testified that Battery Systems hiring process for management positions, unlike at UPS, was to open positions up to outside as well as within the company. No annual increases or inflation increases. The next promotion would be to regional manager of which there are only five positions in the country and the current regional manager, Jeff Proost, was not planning on leaving. Above that position is vice president of the company and owner of the company both of which, Mr. Hardenbrook testified, he was not likely qualified for.

### (c) *Valuation of UPS Restricted Stock Units*

The experts for both sides testified regarding the value of UPS's restricted stock units ("RSU's") as a part of any damages award to Mr. Hardenbrook. For the most part, the experts agreed on the calculations for the RSU with the exception of the net discount rate used to calculate the present value of the RSU. However, the difference in the present value calculation used by each expert is significant. Mr. Reinstein used a zero percent net discount rate to calculate the present value of the RSU which yields a total amount under Scenario 1 for all 27 years of Mr. Hardenbrook's work-life of $252,786. (Pl.'s Ex. 280.) Whereas Mr. Hofman used a 10.5 percent net discount rate resulting in a present value of the RSU at $79,541 for the same period of time. (Def.'s Ex. 557.) The resulting difference between the experts' calculations is $173,245.

In his direct testimony, Mr. Reinstein described UPS's program for restricted stock and then described how he calculated Mr. Hardenbrook's loss as associated to the RSU. The loss calculation looked at what Mr. Hardenbrook had received in the 2 years prior to his termination and assumed that his awards would have been similar to that going forward. He testified that he looked at "various sources" and compared UPS with the growth rates of other peer companies, large capital companies, for the last 50 years based on Ibbotson and Associates which, he testified, is a "publication that provides that kind of statistic" and arrived at the average growth rate of 8 to 9 percent. He testified that he then looked at UPS's growth rate since it became a publicly traded company and found it to be "fairly

marginal" and only about .5 percent. He then looked at UPS's stock price growth for the last year which was around 18 percent and at the forward projections estimating growth of 23 to 24 percent for the next 12 months and around 8 percent for the next 5 years. The projections, Mr. Reinstein testified, were obtained from Yahoo! Finance. Based on these figures, Mr. Reinstein calculated a net discount rate of zero that he applied to determine the present value of the RSU.

Mr. Hofman challenged Mr. Reinstein's use of a zero percent net discount rate as unsound because, he argues, it does not properly value the risk associated to the UPS stock nor discount the future money to present value.[15] Instead, he applied a 10.5 percent net discount rate in compiling Defendant's Exhibit Number 557 which details his estimates of the present value analysis of RSU's for each year from 2006 to 2037. This exhibit, Mr. Hofman testified, is essentially the same as Mr. Reinstein's calculations for RSU except for the calculation of present value and cumulative present values. (Def.'s Ex. 557.)

The 10.5 percent net discount rate was derived primarily by taking the value of UPS Stock as contained in Mr. Reinstein's earlier report. Mr. Hofman testified the 10.5 percent net discount rate is the "UPS discount rate" figure of between 10.4 and 11.5 percent in Mr. Reinstein's earlier report, then he subtracts .3 percent

---

[15] Mr. Hofman provided testimony regarding the future valuation of stocks. He stated the higher the risk of the asset you are valuing, the higher discount rate you use meaning the lower the present value will be because it is more risky that you won't get that money in the future. "So the higher the discount rate, the lower the present value." (Hofman Test.) Here, the asset is UPS stock which, Mr. Hofman testified, carries a higher risk as compared to government treasury securities or bonds and that risk must be accounted for in valuing the future stock.

to account for the historical growth of UPS stock, and arrives at a net discount rate of 10.5 percent. (Hofman Test.) There was, however, no testimony or evidence as to the basis for the "UPS discount rate" figure. Instead Mr. Hofman testified that he "reviewed plaintiff's own report and their own opinion on what the discount rate is. My analysis was analyzing plaintiff's claim and in their own report they said what they thought the UPS discounts rate was...I took their own discount rate at face value and said, well, you should have applied it, and they didn't." On cross-examination, Mr. Hofman admitted he did not take into account any future projections of UPS stock but, on redirect, testified that even considering future projections, they would not result in a net discount rate of zero as applied by Mr. Reinstein.

On recall, Mr. Reinstein defended his use of zero as the net discount rate. There he testified that he calculated the net discount rate by taking the anticipated cost of capital of a company and subtracting those from the expected rate of return. He opined the present value calculation has nothing to do with how risky the stock might be as Mr. Hofman opined. Mr. Reinstein then again testified as to the figures he used to arrive at the net discount rate. First, UPS stock had increased at a rate of 18 percent over the previous 12 months and that the projection for the next 12 months was a 23 to 24 percent increase. The five year projection is approximately 8 percent. He then used "the capital asset pricing model" from which he determined the cost of capital for UPS would range between 7 and 8 percent. He then compared those numbers to the projections for

UPS stock in the future that expected an increase in value. Finally, he looked at the last 50 years of stock increases for large capitalized companies, of which he argues UPS is considered, and found the average rate of return to be between 8 and 9 percent. Taking all of these figures into consideration he arrived at an expected future increase in value of between 8 and 9 percent and estimated the cost of capital to be between 7 and 8 percent yielding a difference of 1 percent which would create a negative net discount rate. To be conservative he applied a rate of zero rather than a negative.

Having viewed the evidence first-hand and now having again reviewed the same in great detail, the Court finds the zero percent net discount rate used by Mr. Reinstein seems to ignore the time value of money when the expert also calculates a substantial growth rate in the value of the UPS stock in the future. The Court is concerned that the Plaintiff's expert's discount rate calculation for the stock is not supported by basic economic principles and/or methodologies which would normally be used by economists in determining the present value of money to be earned in the future. Moreover, the Court is concerned that the growth rate for UPS stock in the future is quite possibly overstated based on the historical stock growth actually experienced by UPS since going public. On the other hand, the Defendant's economist did not articulate how to properly calculate a discount rate for stock growth in this particular case, but instead testified the method used by Plaintiff's expert, who is not an economist, but a business valuation expert, was not a normally accepted calculation method for discount rates on future stock price

increases over a significant number of years.[16] When it came to the calculation of the present value of the RSU, the Plaintiff's expert testified regarding his calculation and supporting basis for applying a net discount of zero. The Defendant's expert was critical of this approach and, instead, calculated the RSU's present value using, primarily, a figure from the Plaintiff's expert's prior report. The defense did not, however, identify where the figure was derived from or what the basis for the figure was other than that it was in Mr. Reinstein's prior report.[17] None of the expert reports are in evidence for the Jury or this Court to review and determine whether Mr. Hofman's use of the figure is sound. Further, the defense expert does not seem to have given enough weight to the future growth projections for UPS stock.[18] Therefore, the Court does not have credible evidence before it

---

[16] Mr. Reinstein testified that he had a bachelor's degree in agriculture, a bachelor's degree in accounting, and attended other classes on business financial advisory services and consulting. He stated that he is a member of the Idaho Society of Certified Public Accountants, the American Institute of Certified Public Accountants, the National Association of Certified Valuation Analysis, the American Society of Appraisers, and the American Academy of Economic and Financial Experts. Mr. Reinstein also testified that he currently holds a license as a certified public accountant (CPA), a designation as a certified valuation analysis (CVA), a designation as accredited in business valuation (ABV), and a designation as an accredited senior appraiser (ASA). Mr. Hofman testified that he had a bachelor's degree in Asian studies, a master's degree in Japanese studies, and an MBA in economics and finance.

[17] Mr. Hofman testified that his role here was to look at "financial and economic data relevant to a piece of litigation and try to get a true picture of reality based on the financial records...." "To present to [the jury] my findings on the financial and economic data relevant to this case." Issued a report summarizing his review and analysis of Plaintiff's economic loss claim citing errors in the Plaintiff's economic expert report.

[18] Mr. Hofman testified that though he did not look at projections of UPS stock value in calculating his net discount rate but acknowledged that it is a "component that economists sometimes look to when analyzing stock and business values." Though true the historical growth of UPS's stock was not significant, its recent growth and future projections are higher than the historical performance of the stock.

which would allow the Court to calculate a discount rate other than a zero percent discount rate for purposes of ruling on the remittitur motion.

Though the Court has serious reservations about this rate, it is the only figure that has any evidentiary basis to support it in the record. It would seem at first blush that Mr. Hofman's use of a figure from the Plaintiff's prior report is reasonable, however, there simply is nothing in the record upon which to accept the use of the figure. The only indication given as to the source of the figure, aside from that it is the one used in the Plaintiff's prior report, is on Defendant's Exhibit 557 itself at the top which attributes the UPS discount rate as being derived from "the Butler-Pinkerton model according to plaintiff's expert." (Def.'s Ex. 557.) There was no testimony regarding this model nor any testimony as to where the figure contained in the Plaintiff's expert report came from. As such, the Court finds it improper to blindly rely upon the figure without some kind of testimony as to its source and reliability. Mr. Hofman did testify that he was not quarreling over the figure and that he simply used the figure given by Mr. Reinstein. Such testimony, however, does not provide any kind of weight or support for relying upon the figure. To simply adopt the figure because it was included in the Plaintiff's prior report, which was not a part of the evidence, would be speculative and improper. Therefore, the Court will apply Mr. Reinstein's calculation of present value for the RSU's as the defense has offered no evidence to support its use of a 10.5 percent net discount rate.

*(d)*    *Defined Benefit Plan*

Mr. Hofman testified that the value attributed by Mr. Reinstein to the defined benefit plan was in error because there were two funding sources; UPS and the multi-employer plan. Thus, he opined, the value given to the defined benefit plan in Plaintiff's Exhibit 280 must be reduced to account for the multi-employer plan because that portion is not lost with the loss of employment at UPS.

The second error in this calculation discussed by Mr. Hofman was the fact that pension plans generally utilize a formula for its calculations which differ with every employer and are very proprietary. These formulas, he argues, can be very specific to the number of years worked at a particular salary and, therefore, can not simply be reduced in lumps sums such as nine, eighteen, or twenty-seven years as was done in Plaintiff's Exhibit 280. The Plaintiff countered that only UPS has this exact formula and it has not been disclosed to anyone, including Mr. Hofman who could likewise not have calculated the lost pension benefits on a year-by-year basis.

Having viewed the evidence and reviewed the transcript, the Court finds Mr. Reinstein's calculations for UPS's defined benefit plan are reasonable. Mr. Reinstein testified that he was unable to do a year-by-year analysis because the information regarding the pension benefits were requested but not provided. Instead, he testified, that he used the information that was provided by UPS that showed what Mr. Hardenbrook's benefits were going to be just before he was terminated and then what they were going to be as a result of his termination. Even

though pension benefits would have increased had Mr. Hardenbrook remained employed at UPS, because he did not have information upon which to make such calculations, Mr. Reinstein stated that he froze his calculation based upon information that was available at the date of his termination. This is true for both scenarios. The result is a summary over the three time periods to provide the Jury a reasonable approximation of what the total elements of losses would be over those time periods. As to the multiple employer plan issue, Mr. Reinstein testified that the participating companies are all UPS companies and so the amount Mr. Hardenbrook stood to receive from the plan was the same whether it came from the main UPS entity or another of its subsidiaries. Therefore, no reduction is appropriate for the portion funded by the subsidiary companies.

### (e)    *Unemployment Adjustment*

Mr. Hofman testified that there should be an unemployment adjustment included in the calculation of lost wages and benefits. Mr. Hofman's statistic was derived from the Bureau of Labor Statistics "Table 10 Employment Status of the Civilian Noninstitution Population by Education, Age Sex, Race, and Hispanic Origin, annual Average for the Years 1994 through 2007." (Hofman Test.)

Mr. Reinstein countered that he did not utilize an unemployment factor because in this case there is information about the specific wages and job history. The unemployment factor is a general calculation that would apply, he opined, in a situation where one did not know what the wage history or particulars of a given case and you had to take a more general or broader overview of benefits and

adjustments to benefits. Regardless, the discrepancy on this issue accounts for only a two percent difference between the two experts' calculations and both experts agree the net effect of this adjustment is not significant. The Court agrees and finds the adjustment need not be applied in this particular case given the specific facts and circumstances known regarding Mr. Hardenbrook's employment history and current position.

### C.    Conclusion

The Jury's award of front pay was based entirely on the calculations offered by Mr. Hardenbrook's expert in Scenario 2. Having viewed the evidence at trial and again reviewing it upon these post-trial motions, the Court concludes the assumptions making up Scenario 2 are speculative and should not be considered. Because the Jury relied on Scenario 2 in setting the amount of damages, the Court finds the damages award is "grossly excessive or monstrous," "clearly not supported by the evidence," and speculative. Therefore, the Court will "either grant the motion for a new trial or deny the motion conditional on the plaintiff accepting a remittitur, that is, agreeing to pay a lesser amount of damages that the court considers justified." *Fungi*, 593 F.Supp.2d at 1093. Based on the foregoing, the Court finds the proper amount of a remittitur, or the maximum amount sustainable by the evidence, is $673,169 in front pay damages and $40,000 in back pay.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED** that Defendant's Renewed Motion for Judgment as a Matter of Law and Alternative Motion for New Trial or to Alter or Amend the Judgment (Dkt. No. 157) is **GRANTED IN PART AND DENIED IN PART**. The motion is granted as to the issuance of a remittitur in the amount of $673,169 in front pay and $40,000 in back pay for a total award of $713,169. Plaintiff shall have until on or before **October 4, 2010** in which to file a notice indicating his intention of whether or not he will accept the remittitur. Failure to file such notice will result in the Court issuing an order granting the Defendant's Motion for a New Trial and resetting the trial in this matter forthwith.

DATED:  **September 3, 2010**

Honorable Edward J. Lodge
U. S. District Judge